# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 25-484


STATE OF LOUISIANA

VERSUS

CHAD SCOTT


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 2022-CR-039
HONORABLE WARREN D. WILLETT, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## GUY E. BRADBERRY
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Candyce G. Perret, Gary J. Ortego, and Guy E. Bradberry, Judges.


**REVERSED AND REMANDED.**

**Annette F. Roach**
**Roach & Roach, APLC**
**Post Office Box 6547**
**Lake Charles, Louisiana 70606**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT:**
      **Chad Scott**

**James P. Lemoine**
**District Attorney**
**Jimmy D. White, Jr.**
**Assistant District Attorney**
**Thirty-Fifth Judicial District Court**
**Post Office Box 309**
**Colfax, Louisiana 71417**
**(318) 627-2971**
**COUNSEL FOR:**
      **State of Louisiana**

**BRADBERRY, Judge.**

On May 31, 2023, the State filed an amended bill of information charging Defendant Chad Scott with one count each of aggravated burglary of an inhabited dwelling, a violation of La.R.S. 14:60; attempted second degree murder, a violation of La.R.S. 14:27 and 14:30.1; home invasion, a violation of La.R.S. 14:62.8; and cruelty to a juvenile, a violation of La.R.S. 14:93.

Pursuant to the original bill filed on January 14, 2022, court proceedings had already ensued.[1] On Defendant's motion, the trial court appointed a sanity commission on August 18, 2022. On October 13, 2022, the trial court granted Defendant's motion to change his plea from "not guilty" to "not guilty by reason of insanity." On April 13, 2023, the trial court found Defendant capable of assisting in his defense.

The parties selected a jury on June 24–25, 2024. As will be discussed under the appropriate assignment of error, lead defense counsel suffered an illness and could not be present during the entire selection process. The jury began hearing evidence on August 18, 2024. In a unanimous vote, the jury found Defendant guilty of all four counts on August 21, 2024.

Defendant now appeals his convictions and sentences, asserting seven errors. For the reasons set forth below, Defendant's convictions and sentences are reversed, and the case is remanded for a new trial.[2]

---

[1] The original charges were aggravated burglary of an inhabited dwelling, a violation of La.R.S 14:60, and attempted first degree murder, a violation of La.R.S. 14:27 and La.R.S. 14:30.

[2] Louisiana law permits retrial when a defendant's conviction is reversed due to trial error, such "as the 'incorrect receipt or rejection of evidence.'" *State v. Bennett*, 544 So.2d 661, 663 (La.App. 3 Cir. 1989) (quoting *Burks v. United States*, 437 U.S. 1, 15, 98 S.Ct. 2141,2149.)

**FACTS**

In Grant Parish, on the evening of November 10, 2021, James Bruce, his wife Devyn, and their five-year-old son B.B. went to sleep in their master bedroom. James Bruce awoke to the sound of his door being kicked in. He armed himself with a pistol from a nearby nightstand and noticed that his security camera system had activated. He looked toward the door but could not see into the hallway. When a person came through the bedroom door, James Bruce fired three or four times, and the intruder screamed and retreated. Devyn Bruce and the little boy then took shelter in the master closet. She called 911, and the intruder called out that he was Chad Scott and he was wounded. Scott, the current Defendant, was a former friend of the Bruces.

After learning that parish deputies were approximately thirty minutes away, James Bruce, a Wildlife and Fisheries agent, called Georgetown Police Officer Brandon Malloy, a colleague who lived within two miles of the scene. When Malloy arrived, he and James Bruce found Defendant slumped against a door in the hallway. The latter had two gunshot wounds, and a loaded pistol was lying on the floor next to his right leg.

**ASSIGNMENTS OF ERROR NUMBERS ONE THROUGH THREE**

In his first three assignments of error, Defendant argues the evidence adduced against him at trial was insufficient to support his convictions. "When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first assess the sufficiency of the evidence, *see State v. Hearold*, 603 So.2d 731, 734 (La. 1992)[.]" *State v. Fisher*, 19-1899, p. 5 (La. 5/13/21), 320 So.3d 400, 404.

The general analysis for such claims is settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied,* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King,* 436 So.2d 559 (La.1983); *State v. Duncan,* 420 So.2d 1105 (La.1982); *State v. Moody,* 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino,* 436 So.2d 559 (*citing State v. Richardson,* 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Defendant was convicted of aggravated burglary, pursuant to La.R.S. 14:60(A)(1): "Aggravated burglary is the unauthorized entering of any inhabited dwelling . . . where a person is present, with the intent to commit a felony or any theft therein, under any of the following circumstance: (1) If the offender is armed with a dangerous weapon." Aggravated burglary is a specific intent crime. *State v. Brandenburg*, 06-1158 (La.App. 3 Cir. 2/7/07), 949 So.2d 625, *writ denied*, 07-538 (La. 10/26/07), 966 So.2d 571, *writ denied*, 07-614 (La. 10/26/07), 966 So.2d 573; *State v. Hennis,* 98-664 (La.App. 1 Cir. 2/19/99), 734 So.2d 16, *writ denied,* 99-806 (La. 7/2/99), 747 So.2d 16. Specific intent is defined in La.R.S. 14:10 as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."

Defendant's conviction for attempted second degree murder was based on La.R.S. 14:27 and La.R.S. 14:30.1. Louisiana Revised Statutes 14:27(A) defines attempt, in pertinent part, as: "Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending toward the accomplishing

3

of his object is guilty of an attempt to commit the offense intended[.]" Louisiana Revised Statutes La.R.S. 14:30.1(A)(1) defines second degree murder as charged in the present case: "[T]he killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]"

Defendant's conviction for home invasion was based on La. R.S. 14:62.8(A), which states:

> "Home invasion is the unauthorized entering of any inhabited dwelling, or any other structure belonging to another and used . . . . as a home or place of abode by a person, where a person is present, with the intent to use force of violence upon person of another[.]"

It is a specific intent crime. *State v. Clarke*, 21-1460 (La. 6/29/22), 345 So.3d 1015.

The final offense at issue is defined by La.R.S. 14:93, which states, in pertinent part:

> A. Cruelty to juveniles is:
>
> (1) The intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child's age shall not be a defense[.]

Defendant does not contest that the actions described in the "Facts" section occurred. He stated this succinctly in his opening and closing statements. His contention in the first two assignments of error is that the State failed to prove the required intent levels to support the convictions for the three foregoing offenses. The record indicates that Defendant did not pursue this line of reasoning during examination. Instead, he focused on his alleged inability to tell right from wrong. During closing arguments, Defendant suggested that the evidence did not show intent sufficient to support the convictions. However, it is noted that Defendant immediately tied the intent issue to his claim of insanity. He asserted that he believed he entered the Bruces' home as a peacemaker, as telepathic voices were

4

telling him that James Bruce was beating Devyn Bruce in the presence of the child. Nonetheless, pursuant to *Kennerson* and the jurisprudence cited therein, the State had to prove all the elements of the crimes beyond a reasonable doubt.

We find the Defendant's act of kicking in the Bruces' door at night while armed, then entering their bedroom, shows specific intent sufficient to support the first three convictions. His actions clearly violated the language of the home invasion statute. Regarding aggravated burglary and attempted murder, Defendant brought a loaded firearm into the Bruces' home under cover of night. In addition, he had previously told third parties that he would kill James Bruce. Again, Defendant's actions regarding the offense are not contested; however, the questions of whether he had the intent to commit a felony after entry, thus committing aggravated burglary, or whether he had the intent to kill, thus committing attempted second degree murder, deserve further mention.

As discussed, the first three offenses are specific intent crimes. The final offense, cruelty to a juvenile, requires criminal negligence. That he conducted these actions in a home where a five-year-old child was present, a child he had been close to, supports a finding that he was at least criminally negligent regarding the child. As noted earlier in the "Facts" section, Defendant had been a friend of the Bruces. There was testimony that the child had called him "Uncle Chad." Thus, Defendant had reason to know the young victim would be present. Criminal negligence is defined by La.R.S. 14:12:

> Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.

5

We find Defendant's actions were criminally negligent in this case. Kicking in the door of a home at night will foreseeably frighten any children present and would likely frighten most adults. Defendant's actions grossly deviated from any reasonable standard of care regarding the child. Further, testimony in the record shows that the child was traumatized by the incident. Thus, Defendant's actions met the statutory definitions of home invasion and cruelty to a juvenile.

As noted earlier, questions regarding Defendant's intent were linked at trial to the question of his sanity at the time of the offenses. He raised this question by pleading not guilty and not guilty by reason of insanity. This plea made sanity the true crux of the present case, pursuant to La.R.S. 14:14, as the record evidence shows as well as his own statements in the opening and closing arguments. Louisiana Revised Statutes 14:14 states: "If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility."

Defendant cites another case from this circuit:

> "If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility." La.R.S. 14:14. A rebuttable presumption exists under our law that a "defendant is sane and responsible for his actions." La.R.S. 15:432. "Insanity is an exculpatory fact which constitutes an affirmative defense" and "[d]ue process does not prohibit placing the burden of proving an exculpatory fact on defendant." *State v. Thompson*, 429 So.2d 862, 865 (La.1983) (citing *Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952)). At trial, "[t]he defendant has the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence." La.Code Crim. P. art. 652.
>
> Our appellate standard of review in this case as to the sufficiency of proof of insanity was succinctly set forth by the supreme court in

> *State v. Williams*, 07-1407, p. 8 (La. 10/20/09), 22 So.3d 867, 876, *cert. denied*, 560 U.S. 905, 130 S. Ct. 3278, 176 L.Ed.2d 1184 (2010).

> In reviewing a claim for insufficiency of evidence in an action where the affirmative defense of insanity is raised, the appellate court, applying the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorably to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. *State v. Peters*, 94-0283, p. 8, 643 So.2d [1222] at 1225; *State v. Armstrong*, p. 4, 671 So.2d [307] at 309; *State v. Nealy*, 450 So.2d 634, 639 (La. 1984).

*State v. Williams*, 20-609, pp. 12–13 (La.App. 3 Cir. 10/20/21), 329 So.3d 885, 893 (alterations in original).

Defendant notes testimony regarding changes in his personality in the months preceding the offenses.

Several witnesses, including Devyn Bruce, testified that Defendant had been a kind, friendly man but his personality changed in the months preceding the offenses, with Defendant sometimes exhibiting paranoia. Devyn Bruce, who had known Defendant for more than a decade, noticed that he had noticeable weight loss in 2020 and 2021. Also, he quit his job in March 2020. In March 2021, she learned that he had tested positive for methamphetamine. After that positive test, Defendant's wife, Samantha Scott, asked James Bruce to help her remove Defendant's weapons from the Scott home.

Chris Paul, the chief of police of Pollock, Louisiana, testified that he had also been a longtime friend of Defendant's. Paul testified that approximately two weeks before the offenses, Defendant had threatened to kill James Bruce. Paul explained that Defendant was angry because James Bruce had removed guns from the Scott

7

home.  Paul testified he had experience with people on methamphetamine, as he had once served on a "Meth Task Force."  He stated that methamphetamine users may exhibit symptoms such as paranoia and weight loss.  According to Paul, Defendant displayed paranoia and a short temper but not weight loss.  Paul was aware of Defendant's positive drug test.  On cross-examination, Paul noted that Defendant had been "a good friend."  The Bruce's son called Defendant "Uncle Chad."  Paul made a pretrial statement that Defendant's behavioral changes were unlike what Paul had seen in other methamphetamine users.  During re-direct examination, Paul explained that drug users tend to be more reticent than Defendant was, as the latter's behavior was more "blatant."  He further explained that Defendant came to his house making threats toward James Bruce and complained about an alleged wrong by the clerk of court's office.  In Paul's view, it was atypical for a drug user to approach a police chief, even a friend, with such paranoid complaints.

The next witness was Dry Prong police officer Harry Robertson, who had considered Defendant to be his best friend.  He described Defendant as normally "very kind hearted."  Robertson initially testified that about three months before the offenses at issue, he gave Defendant a ride after the latter failed a drug test.  A prosecutor showed Robertson a copy of the test, and he acknowledged the test date was March 2, 2021.  At the time of the pick-up, Defendant was "irate."  Robertson noted that Defendant's wife wanted to get guns out of the Scott home due to Defendant's positive meth test and his anger issues.  Robertson noted that Defendant showed paranoia, saying that his cell phone was bugged and that people in the woods were watching him.  In early October, Defendant called Robertson complaining about James Bruce's removing guns from the Scott home and threatening to kill James Bruce.  Robertson testified he did not believe Defendant would follow

8

through on the threat, but he called James Bruce to warn him. Defendant also mentioned possibly putting tacks in James Bruce's "driveway to mess up his truck." Robertson was in the Scott's home after the offenses and did not see any illicit drugs but saw some prescription medication.

James Bruce testified that he and Defendant had been friends for many years. Their relationship changed in March 2021 when James Bruce learned from Defendant's wife Samantha that he had tested positive for methamphetamine. James Bruce was supposed to pick up Defendant after his positive test, but Harry Robertson went instead. James Bruce went to the Scott home to help Mrs. Scott move some of her property out and to remove Defendant's guns. James Bruce loaded the firearms into Mrs. Scott's vehicle; she feared Defendant would hurt himself.

James Bruce further testified that Defendant had been a friendly person who liked to joke around. He did not personally see any behavioral changes in Defendant, before the drug test. Defendant made multiple phone calls to James Bruce, angrily seeking the return of his guns. James Bruce called Mrs. Scott, secured most of the weapons, with Mrs. Scott retaining "one (1) or two (2) handguns," and returned them to Defendant. The Bruces then decided to distance themselves from Defendant, mainly due to the latter's methamphetamine use. However, about a week before the offenses, James Bruce was in Jena, Louisiana and noticed Defendant was watching him. As James Bruce came through the drive-through at Popeye's, he saw Defendant parked on the opposite side of the road, staring at him. After the incident, James Bruce contacted Mrs. Scott, as he thought Defendant might be looking for her. In the course of the conversation, he learned that Defendant had threatened to shoot him. Around that time, Chief Paul and Robertson also told him of Defendant's threats. James Bruce testified that at the time, he did not think Defendant would

actually shoot him, but the Jena encounter made him uncomfortable. He had concerns about his family's safety, so he bought a security camera system for his home. After the incident, he questioned whether Defendant's actions were the product of methamphetamine use or a mental issue; in his testimony, he explained that others in their circle of friends had asked the same question. During re-direct testimony, James Bruce acknowledged he had thought Defendant's problems were related to methamphetamine use. This opinion was based mainly on Defendant's noticeable weight loss.

The State also adduced the testimony of Teresa Raiford, Samantha Scott's aunt. She recounted a conversation in which Defendant stated that he was going to kill James Bruce. She could not remember exactly when the conversation happened, but she stated it was within a year of the offenses. It was also on a day when Defendant had seen James Bruce in Jena. On cross-examination, she stated that six to twelve months before the offenses, Defendant's behavior and various statements caused her concern regarding his mental health. At one point, he was talking about hearing people in the woods; nobody else present heard people in the woods. She was aware of his failed drug test but had not personally seen him use illegal drugs.

Rhonda Welch, Defendant's half-sister, was his first witness. She testified that his behavior started changing about six months before the offenses at issue. He cried frequently and developed a short temper. When Welch visited Defendant in the hospital, he claimed that he was getting telepathic messages bouncing off of area towers. He said these messages told him that James Bruce was beating Devyn Bruce in front of their child, and Defendant planned to stop the beatings. During the State's cross-examination, it was revealed that on the night of the offenses, Defendant tested positive for alcohol, amphetamines, benzodiazipine, and opioids. Welch contended

10

that Defendant was prescribed a number of drugs at the time, including an amphetamine for ADHD. She stated that she thought Defendant was going through some sort of mental health issue. At one point, he threw furniture off the front porch. She noted they had an older brother who had been a methamphetamine user, but his behavior was different than Defendant's. However, she did not give details regarding the older brother's behavior.

As seen in the testimony, there was evidence that Defendant tested positive for amphetamine on the night of the offense and had also tested positive previously.[3] As with the evidence regarding Defendant's actions on the night of the offenses, the evidence regarding his personality changes and drug use was not a matter of dispute at trial. As stated earlier, the real dispute was over whether Defendant was insane at the time of the offenses.

Thus, multiple witnesses attested to Defendant's personality changes, and those changes could have indicated drug use, mental illness, or both.[4] Each party presented the testimony of a mental health expert in an effort to support its respective position in the case.

In his case-in-chief, Defendant introduced the testimony of a forensic psychologist, Dr. John Simoneaux. Dr. Simoneaux testified that he examined Defendant and diagnosed him as schizophrenic and suffering from delusions. Dr. Simoneaux further stated that Defendant believed that James Bruce was beating his wife Devyn in front of the child. According to the witness, Defendant believed that

___

[3]The hospital record indicates that Defendant tested positive for amphetamines on the night of the offense; during Dr. Simoneaux's testimony, he referred to the test as being positive for methamphetamine. Dr. Fleming's testimony suggested that amphetamine or methamphetamine would manifest similar symptoms.

[4]Involuntary intoxication is a defense to specific intent prosecutions. *Clarke*, 345 So.3d 1015.

his actions on the night at issue were justified. The psychologist was aware that Defendant had tested positive for methamphetamine use while hospitalized after the incident. Despite this test and earlier test results that showed methamphetamine use, Dr. Simoneaux maintained his schizophrenia diagnosis.

On cross-examination, Dr. Simoneaux testified that he thought Defendant was insane and that he believed his actions were justified at the time he did them. It is noted that Dr. Simoneaux did not appear comfortable answering whether Defendant knew right from wrong, preferring to leave that conclusion to the jury. However, on redirect examination, the expert testified that in his opinion, Defendant was unable to distinguish right from wrong at the time he broke into the Bruces' residence. In his interview with Dr. Simoneaux, Defendant claimed to be a peacemaker who did not want to hurt anybody. It is noted that Defendant kicked in the Bruces' door at night while armed with a weapon and advanced into their bedroom as they lay there. While it suggests these do not appear to be the actions of a "peacemaker," Dr. Simoneaux's testimony indicated Defendant's actions were the product of a delusional thought process.

The State called a rebuttal witness, forensic psychiatrist Dr. Ashleigh Fleming. She was accepted and testified as an expert. Dr. Fleming stated that she works at Elayne Hunt Correctional Center, and Defendant was sent there for medical treatment after the incident. She saw Defendant three times, and he also had several nursing assessments. She testified that there were no indications of delusions; Defendant denied drug abuse and acknowledged being treated with Zoloft for anxiety. The diagnosis for Defendant was "unspecified anxiety disorder."

Dr. Fleming noted the difference between her diagnosis and Dr. Simoneaux's diagnosis of schizophrenia may have resulted from Defendant's use of

amphetamines, as stimulants can cause symptoms similar to psychosis. As the State discussed with Dr. Fleming, there was evidence Defendant tested positive for amphetamine and methamphetamine in March 2021. She reiterated that she saw no sign of Defendant's having delusions, and if he did have them at an earlier time, drug use could be the cause. Further, she believed he knew right from wrong. The cross-examination of Dr. Fleming included a lengthy discussion of her methodology.

Subsequently, the trial court granted Defendant's motion for surrebuttal, and Dr. Simoneaux returned to the witness stand. The psychologist attributed the difference between his diagnosis and Dr. Fleming's diagnosis to the latter's lack of time spent assessing Defendant. He noted that he heard her testimony, and he suggested she was able to take only about fifteen minutes with each of her patients. He opined that it would be difficult to make accurate diagnoses while working in that sort of time constraint. He stated that she did not perform psychometric testing and that few psychiatrists do, as they are not trained to use such testing. He said mental diagnoses should be based on multiple sources, including objective psychometric/psychological tests. He stated he was confident in his diagnosis and his determination that Defendant was insane at the time of the offenses.

On cross-examination during surrebuttal, the prosecutor discussed other professionals who had treated or counseled Defendant, including Dr. Hugh Bryan and a marriage counselor. There was also Dr. Patrick Wheat, who apparently also treated Defendant. Dr. Simoneaux acknowledged that Dr. Wheat, a psychiatrist, did not find any evidence of schizophrenia. He further acknowledged that Dr. Michael Gallagher, a member of the sanity commission, did not find Defendant to be schizophrenic.

On redirect examination, Dr. Simoneaux stated that some of the testing done by Dr. Bryan showed elements that Dr. Simoneaux considered supportive of his diagnosis of Defendant as schizophrenic, e.g., paranoia, suspiciousness, and feelings of persecution.

In his brief, Defendant acknowledges that he had the burden of demonstrating insanity by a preponderance of the evidence. On appeal, he reviews testimony by various witnesses that he had an apparent personality change in the months before the offenses. He acknowledges that two of his friends believed his troubles stemmed from drug abuse. However, he notes that some of the indicators they saw contradicted one another. James Bruce expressed doubt regarding whether drugs or mental illness caused the problem.

Pursuant to *Kennerson*, 695 So.2d 1367, and *Williams*, 329 So.3d 885, any doubt that witnesses had about the cause of Defendant's problems was a matter for the jury to weigh. The same is true of the conflicting testimonies of defense expert Dr. Simoneaux and prosecution expert Dr. Fleming. Dr. Simoneaux was firm in his diagnosis that Defendant suffers from schizophrenia, and Dr. Fleming testified that she saw no signs of the disorder. Under the jurisprudence cited, the ultimate question of Defendant's sanity was within the province of the jury. Pursuant to *Kennerson*, the evidence adduced in the record shows the jury's verdict was rational.

For the reasons discussed, the first three assignments of error lack merit.

### ASSIGNMENT OF ERROR NUMBER FIVE

In his fifth assignment of error, Defendant argues the trial court erred by allowing "the State to question the defense expert at length concerning reports and conclusions" of other professionals who did not testify at trial and whose reports had not been admitted at trial.

The rule for such a claim is set forth in La.Code Evid. art. 705(B), which states, "In a criminal case, every expert witness must state the facts upon which his opinion is based, provided, however, that with respect to evidence which would otherwise be inadmissible such basis shall only be elicited on cross-examination."

At issue is the following colloquy from the State's cross-examination of Dr. Simoneaux on surrebuttal:

BY MR. WHITE:

Q      Just a few questions. Um, you indicated Doctor Fleming's jar - - job was difficult uh, why was Doctor Fleming - - what - - what was she doing with Mr. Scott? What was her purpose?

A      She was treating him.

Q      Treating physician, okay.

A      Right.

Q      What about uh, Doctor Bryan?

A      It was my understanding, I haven't talked to Doctor Bryan and I saw limited information, but my understanding was, Doctor Bryan saw him in the context of them doing marital therapy with Ms. Tilley.  Ms. Tilley asked for Doctor Bryan to do the psychological tests, so he was essentially a consultant I believe to Ms. Tilley, to help guide her and the marriage therapy.

Q      For the treating of do - - Chad Scott, . . .

A      Treating.

Q       . . . treatment.

A      Treatment, that's correct, yes.

Q      Short - - short answer with Doctor Bryan would have been . . .

A      Uh, you know, if I . . .

Q      He just assisted in the treatment of - - of Chad Scott?

A      That's a good way to say it, that - -

Q      What about Doctor Wheat? You - - you indicated you knew him?

A      I know him superficially . . .

BY MR. BECK:    I object to - - to the testimony about Doctor Wheat, it hadn't been entered into evidence yet. Uh, . . .

BY MR. WHITE: That's what I'm trying to do right now.

BY MR. BECK: Oh, I don't think he can testify as to Doctor Wheat's opinion.

BY MR. WHITE: Well he did yesterday.

BY MR. BECK: Said he knew Doctor Wheat, told him Doctor Wheat didn't find any evidence of psychosis or Schizophrenic.

BY MR. BECK:    Well . . .

BY MR. WHITE:  And he testified to that.

BY THE COURT: Counsel,    why    don't    you    direct    your arguments to me . . .

BY MR. WHITE:  Yes, of course.

BY THE COURT:  . . . instead of each other?

BY MR. BECK:    Hey, can we make an argument outside of the presence of the jury in case it interjects facts that. . .

BY THE COURT: I'm going to overrule the objection uh, given that the purpose of the surrebuttal was to address new evidence so the Court is going to allow it.

BY MR. BECK:    Please note my objection.

BY THE COURT: **So noted.**

BY MR. WHITE:

Q      Doctor Wheat, what was Doctor Wheat hired by Chad - - Chad Scott or why did he look at Chad Scott?

A      Uh, I only saw his records, I believe he was treating him as well.

Q      Right.

A      Through the Mental Health Center.

16

Q    Can you - - so you saw those records?

A    I did.

Q    Okay, uh, did you see the uh, the part where Doctor Wheat uh, came up with the diagnosis?

BY MR. BECK:    I object again, Your Honor, and I want to - - I - - I want to put this objection on - - on the record, if the Court overrules me, I understand and respect your decision.

Mr. White is attempting to put into evidence in front of the jury . . .

BY MR. WHITE:  Judge, I'm going to have a standing objection uh, I'm not asking to do that in front of the jury, I think that's something that needs to be done in front of the Court.

BY THE COURT: Ladies and gentlemen, I'm going to ask that you step outside.

## JURORS EXIT THE COURTROOM

BY MR. BECK:    May I continue, Your Honor?

BY THE COURT: You may.

BY MR. BECK:    Your Honor, I'm objecting for a lack of foundation and uh, and so what Mr. White is trying to do is through his own testimony, a leading question to my witness introduce evidence from a report on a doctor that's not been called, so this report has not been identified, this report has not been verified by the doctor that made it, it's not been introduced into evidence, it is not before the jury or court at this point, and Mr. White trying to back door it by bringing a statement from a doctor's report that never testified, is improper evidence. That - - that's my objection, thank you, Judge.

BY MR. WHITE:  And Judge, this is expert testimony, he says - - he indicated he's had a chance to review the report, he - - he's used high - - hide all of this information to form his conclusion or opinion

He's been called on surrebuttal uh, and I'm trying to show that that doctor was a treating physician as well as Doctor Fleming, as well as Doctor Bryan.

BY THE COURT: Counsel, uh, Code of Evidence Article 705, which deals with the disclosure of facts underlining an expert opinion provides and subparagraph B, that in a criminal case every expert witnesses must state the facts upon which his opinion is based.

17

Provided however that with respect to evidence which otherwise would be admissible such bases shall only be elicited on cross examination. I realize this is surrebuttal, but it is in a sense a cross examination of Doctor Simoneaux do - - he is your witness and the Court feels that the State is allowed to allowed [sic] to question him on facts or sources of information that may have influenced his opinion.

BY MR. BECK: Thank you, Your Honor, and we would object [to] the Court's ruling.

**JURORS ENTER THE COURTROOM**

BY THE COURT: Ladies and gentlemen, the Court has overruled the objection. Uh, Doctor Simoneaux, you can answer the question if you remember it.

As seen in the cited colloquy, the trial court initially relied on the purpose of surrebuttal but ultimately relied on the language of La.Code Evid. art. 705(B). Regarding the purpose of surrebuttal, we note the following discussion by the second circuit:

When rebuttal goes beyond the usual and injects new issues and evidence into the proceeding, elemental fairness requires that the defense be allowed to meet that showing by adducing additional evidence on point in surrebuttal. A failure to afford a defendant this opportunity has been held to be reversible error. *State v. Koon*, [96-1208 (La. 5/20/97), 704 So.2d 756, *cert. denied*, 522 U.S 1001, 118 S.Ct. 570 (1997)] *supra*.

The determination of whether evidence is rebuttal evidence and hence, admissible, is an issue which is addressed to the sound discretion of the trial court judge. *State v. Huizar*, [414 So. 2d 741 (La.1982)] *supra*; *State v. Green*, 390 So.2d 1253 (La.1980).

*State v. Franklin*, 42,055, p. 21 (La.App. 2 Cir. 5/9/07), 956 So.2d 823, 837, *amended on reh'g*, *writ denied*, 07-1489 (La. 1/11/08), 972 So.2d 1162. The purpose of allowing surrebuttal is to allow a defendant to address new evidence; this was the reason the trial court allowed surrebuttal in the present case. Logically, it is not clear how the court's allowing information from non-testifying professionals furthered this purpose. However, as already mentioned, the trial court finally rested its ruling on La.Code Evid. art. 705.

18

On appeal, Defendant cites *State v. Holmes*, 06-2988 (La. 12/2/08), 5 So.3d 42, *cert. denied*, 558 U.S. 932, 130 S.Ct. 70 (2009). After noting the lack of a contemporaneous objection, the supreme court stated:

> Moreover, La.Code Evid. art. 705(B) provides that in a criminal case, while every expert witness must state the basis for his conclusion, if the evidence is otherwise inadmissible hearsay, it can be elicited during cross-examination. Accordingly, the State was certainly entitled to ask Dr. Vigan questions about the medical records upon which he relied when he formulated his psychological evaluation of the defendant.

*Id.* at 87 (footnote omitted).

It is suggested that these statements amount to a simple application of the language of La.Code Evid. art. 705.

Defendant also cites *State v. Birklett*, 32,261, pp. 8–9 (La.App. 2 Cir. 12/8/99), 749 So.2d 817, 822–23 (footnote omitted), *writ denied*, 00-558 (La. 9/29/00), 769 So.2d 1215 (alteration in original).

> Defendant claims that the trial court erred in failing to grant a mistrial after the State intentionally introduced other crimes evidence. During the cross-examination of Dr. Vigen, the State asked or stated to Dr. Vigen the following:
>
> > Now I don't recall that you told the jury this part when you were reviewing your report with Mr. Cole, he remained in a Houston jail for four and a half months and then he spent one year in jail in Beaumont for a robbery and kidnaping charge, which was eventually dropped . . . why is it you did not want to tell the jury that statement, I'm not saying it has any significance or anything having to do with his guilt. Why were you hiding from the jury, you and Mr. Cole, the statement that Mr. Birklett spent time in Texas involving robbery, kidnaping charges apparently out of Beaumont that got dropped, this delaying his return to the fine and great state of Louisiana, so that this prosecution could commence? Was there a reason for that?
>
> Defense counsel objected and requested argument outside the presence of the jury. Defense counsel asked for a mistrial and argued that the prosecution had wrongfully painted Defendant as a "bad man" throughout the course of the trial and that the intentional interjection of his incarceration in Texas was in furtherance of that theme. Also at that time, an objection was made concerning the enlarged copy of the Vigen report on display to the jury which

contained the other crimes evidence. Furthermore, defense counsel noted that he had not been given any notice by the State that it intended to introduce other crimes evidence. The State countered that the evidence of other crimes committed by Defendant was within the expert's report, which was the subject of direct examination, and, thus, was "fair game." The report, however, had not been marked or offered as an exhibit by the defense. The trial court ordered that the un-redacted, enlarged report could no longer be displayed to the jury and that the assistant district attorney could not continue with his question that included the reference to Defendant's incarceration, but that a mistrial was not warranted. The trial court suggested to counsel that the jury be admonished, but then ruled that it was not necessary.

In support of this assigned error, Defendant relies on La.C.Cr.P. art. 770, La. C.E. art. 404 B, and La. C.E. art. 612 C. We agree with the State, however, that La. C.E. art. 703 and 705 B apply to this evidence.

La. C.E. art. 703 states, in pertinent part:

Bases of opinion testimony by experts:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing.

La. C.E. art. 705 B provides that an expert must state the facts on which his opinion is based and evidence which would normally not be admissible under another evidentiary rule must be shown to form a basis of the opinion testified to by the expert being cross-examined. The reference to "robbery and kidnaping charges" against Defendant would clearly not be admissible pursuant to any stated exception in La. C.E. art. 404 B. We note that the State did not even attempt such an argument to the trial court. Since, therefore, this evidence qualifies as "not otherwise admissible" under La. C.E. art. 705 B, the State was required to make a preliminary showing that this information was part of the factual basis for the witness' opinions. Since the State failed to do so, this evidence was improperly admitted. Further, it appears from the way the objectionable question was blatantly phrased, that the State interjected this inadmissible evidence intentionally.

The State argues that the two cases cited by Defendant are distinguishable because they dealt with inadmissible other crimes evidence; it argues that the present case addresses "admissible evidence of the reports and findings of the doctors that Dr. Simoneaux did not consider in determining that Mr. Scott was insane. The testimony and reports of Doctors Brian [sic], Gallagher and Wheat are not inadmissible evidence and the questioning of Dr. Simoneaux's nonuse or use of

20

these other doctors['] testimony in forming and testifying about his expert opinion is fair game on cross examination." The State provides no legal authority for its "fair game" theory. It is noted that while the State's brief specifically includes Dr. Hugh Bryan, the Defense brief does not.

This scenario accords with La.Code Evid. art. 705; further, the language of the article and the cases cited by Defendant show that the evidence at issue was admitted in error, at least regarding Dr. Michael Gallagher and Dr. Patrick Wheat. The record indicates that in formulating his diagnosis, Dr. Simoneaux did utilize some of Dr. Bryan's testing. Thus, questions regarding Dr. Bryan's testing in cross-examination during surrebuttal were appropriate. Testimony beyond the discussion of Dr. Bryan's testing, however, was arguably improper.

The discussions of Dr. Wheat's work are more problematic, as the record does not demonstrate that Dr. Simoneaux's opinion was based on any of Dr. Wheat's work. The latter was aware of Dr. Wheat's diagnosis, however, this was not sufficient to satisfy La.Code Evid. art. 705(B), as discussed in *Birklett*. The evidence regarding Dr. Gallagher was in a similar posture. He and Dr. Simoneaux were both on the sanity commission appointed to determine whether Defendant could assist counsel at trial. Dr. Simoneaux was certainly aware of Dr. Gallagher's report but did not rely on it. While on the sanity commission, Dr. Simoneaux and Dr. Gallagher focused on the issue of whether Defendant could assist counsel. At trial, the focus was on whether Defendant was insane at the time of the offenses. Also, the two doctors reached different conclusions while on the sanity commission. Thus, Dr. Gallagher's work would not be admissible under La.Code Evid. 705(B); also, his analysis regarding ability to assist counsel was not relevant to the issue of Defendant's mental state during the offenses.

21

However, even if the evidence gleaned from the non-testifying witnesses was admitted in error, it may be admissible if it is deemed harmless. As the supreme court has explained:

> Confrontation errors are subject to a harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination were fully realized, is nonetheless convinced that the error was harmless beyond a reasonable doubt. *Id.* at 684, 106 S.Ct. 1431. Factors to be considered by the reviewing court include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contracting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* at 684, 106 S.Ct. 1431; *State v. Wille*, 559 So.2d [1321] at 1332 [La.1990]. The verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial is surely unattributable to the error. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

*State v. Broadway*, 96-2659, p. 24 (La. 10/19/99), 753 So.2d 801, 817, *cert. denied*, 529 U.S. 1056, 120 S.Ct. 1562 (2000). Even a "very serious confrontation error" may be harmless. *Id*. at 818.

We find the error in the present case was not harmless. Sanity was the key issue in this case, and the chief testimony on this issue was delivered by one defense witness, Dr. Simoneaux, and one State witness, Dr. Fleming. Other witnesses testified regarding behavioral changes that Defendant displayed in the months preceding the offenses. The evidence regarding his behavioral changes gave rise to the question whether said changes arose from drug use or mental illness; the evidence on this point also came from the two testifying experts. However, the evidence regarding Dr. Gallagher may be considered harmless, as Defendant's opening had already revealed to the jury that Dr. Gallagher had been a member of the sanity commission and had "found no mental illness."

However, the discussion regarding the non-testifying witness Dr. Wheat, including his analysis of Defendant's mental state, could have unduly weighted evidence in the State's favor. The jury was faced with the balancing of two experts' testimonies. Each party adduced expert testimony, and the two experts reached diametrically opposite conclusions. In cross-examination during surrebuttal, the State sought to cast doubt on defense expert Dr. Simoneaux's testimony by asking questions about the conclusions reached by various non-testifying experts. After the trial court's ruling pursuant to La.Code Evid. art. 705, the following colloquy occurred:

**JURORS ENTER THE COURTROOM**

BY THE COURT: Ladies and gentlemen, the Court has overruled the objection. Uh, Doctor Simoneaux, you can answer the question if you remember it.

BY MR. WHITE [sic]:

A.    I think I do, thank you. Uh, I did review Doctor Wheat's uh, report, he was treating him for uh, major depressive disorder and generalized anxiety as well.

Q    Doctor Wheat [is] a medical doctor, is that correct?

A    He's a psychiatrist.

Q    Okay, just like Doctor Fleming?

A    Correct.

Q    So Doctor Wheat, Doctor Fleming, Doctor Bryan all - - all treating, is that correct?

A    That's right.

Q    And if you needed a chance to review that uh, - - Doctor Wheat's uh, examination 6/6/24, you - - you reviewed that, is that what you have indicated?

A    I did.

23

Q      What do you think about Doctor Wheat?

A      I don't know him very well, uh, I met him socially some years ago.

Q      Right.

A      Uh, actually my daughter-in-law babysat his children, . . .

Q      Okay.

A      . . . and I knew him - - I went to a BBQ at his house one time, and that's the only time I've met him, but I - - I've seen his work through the years.

Q      Okay, uh, June of '24, he didn't find any evidence of Schizophrenia, any evidence of psychosis, correct?

A      He did not.

Q      Just like Doctor Fleming didn't find any evidence of psychosis or Schizophrenia, is that correct?

A      She said she did not.

Q      Okay, just like Doctor Bryan didn't find any evidence of psychosis or Schizophrenia?

A      Did he - - did he list any evidence of psychosis or Schizophrenia?

A      There were indications in the PAI report that might have suggested psychosis . . .

Q      Doctor Simoneaux, I'm - - I'm going to ask you for a yes or no. Doctor Bryan, did he . . .

A      It's not a yes or a no answer. Uh, . . .

Q      Well did he indicate . . .

A      . . . I believe there were indications in - -

Q      Doctor Simoneaux, my question to you, is did Doctor Bryan . . .

BY MR. BECK:   I'm going to object, Your Honor. Uh, an expert witness is allowed to explain their answers unlike the lay witnesses.

BY MR. WHITE: Uh, Your Honor, I will give him that chance.

BY THE COURT: The Court is - - the Court is going [to] overrule the objection, the Court will allow Doctor Simoneaux to explain his answer.

BY MR. BECK: Thank you, Your Honor.

BY THE COURT: You can answer.

BY MR. WHITE:

Q     Doctor Simoneaux, did Doctor Bryan indicate any psychosis or Schizophrenia in his testing?

A     In his testing?

Q     Yes, sir. In his report, from his testing?

A     Yes, I think he did.

Q     Okay, and he acknowledged that, and wrote that in his report?

A     I didn't see uh, a report, I saw his testing that, no, his report was very short, . . .

Q     Yes, sir.

A     But I saw testing that reflected, that he was aware of, that reflected psychotic symptoms.

Q     What did he diagnose in his report at the end of it? Did he diagnoses [sic] Schizophrenia, did he diagnose psychotic behavior, did he diagnose any of those things?

A     He did not.

Q     Okay, and he listed a diagnoses at the end of his report, is that correct?

A     He did, I would have to find it to remember what it was, but he did.

Q     If you can, find it uh, . . .

A     All right. I'm not sure I have his report with me because I left some things in my car, I was carrying around such a big load yesterday.

Q     I did the same thing. What about Doctor Gallagher, I realize he was appointed on the sanity commission. He rendered a report, did you review his report?

25

A    I did.

Q    Now Doctor Gallagher wasn't a treating physician, is that correct?

BY MR. BECK:    I'm going to object one more time, Judge. For the record, introduction of opinions and testimony, the experts not called to testify, it's improper, prejudicial.  And I want the record to reflect that I'm preserving the issue and objecting to it, in a timely manner.

BY THE COURT: **So noted**.

BY MR. BECK:    Thank you, Your Honor.

BY MR. WHITE:

Q    So Doctor Gallagher - - Doctor Gallagher, he reported him as psychosis or Schizophrenia in his report?

A    He did not.

Q    And I realize his report was directed at a different question rather than sanity at the time of the offense, is that fair?

A    Yes, that's correct.

Q    But he looked at uh, he looked at Mr. Scott to determine if he was able to discuss it with counsel, is that correct?

A    Yeah, his evaluation was limited to the capacity to stand trial.

Q    Um, I won't cover any more about Doctor Gallagher. But he - - he did find that he was able to assist counsel, and able to participate in this trial is that correct?

A    That was his opinion.

Q    Understood the charges against him, all that sort of thing.

A    Yeah.

Q    Okay. Your purpose for treating or excuse me, your purpose for - - uh, excuse me, used wrong word there didn't I?

A    Yeah.

Q    Your purpose for meeting with Chad Scott was different than at least two (2) of those doctors, is that correct?

A Uh, . . .

Q Doctor Wheat and Doctor Fleming?

A Well different from all three (3), yes.

Q Okay, your purpose was for diagnostic and preparations for courtroom testimony?

A Yes.

Q Okay.

A And, I was appointed to the sanity commission report therefore, directly as to address mental status at the time . . .

Q Yes.

A . . . and competent [sic] to stand trial.

The effect of the cross-examination allowed the State to adduce the conclusions of multiple non-testifying witnesses. Evidence based off the work of Dr. Wheat, as noted earlier, was particularly problematic, as it conceivably affected the weighing of evidence between the two testifying experts, Dr. Simoneaux and Dr. Fleming. These conclusions were congruent with the observations of State witness Dr. Fleming and incongruent with the conclusion reached by defense witness Dr. Simoneaux. On appeal, the State argues Defendant could have called the non-testifying psychologists and psychiatrists as witnesses if he wanted to examine them. The State further infers that Defendant made a tactical decision not to call them.

Regarding this point by the State, the record shows the State planned to call two expert witnesses, but it did not do so:

> BY MR. WHITE: That's all I really have, thank you.
>
> BY THE COURT: And counsel, I'm assuming Doctor Fleming is released?
>
> BY MR. WHITE: That's correct, Judge.

27

BY THE COURT:        Thank you.

**WITNESS RELEASED**

BY MR. WHITE:        Judge, I have two (2) more uh, physicians that are going to be here at 9:00 in the morning, based on my interpretation of how long we would be uh, I do not have any other witnesses in the courtroom to begin testifying at this point.

BY MR. SMALL:        I'm sorry, I didn't hear you.

BY MR. WHITE:        I - - I don't have anybody that - - my two (2) witnesses will be here in the morning.

And Judge, I anticipate those witnesses to take approximately thirty (30) minutes apiece.

BY THE COURT:        Counsel, can y'all approach?

**BENCH CONFERENCE**

BY MR. WHITE:        One of them is in Natchitoches and Doctor Bryan is in Red River in -- over the other side of Marksville.

BY THE COURT:        It's hard to be in two (2) places at once?

BY MR. WHITE:        Yes, sir.

BY THE COURT:        Why aren't they here?

BY MR. WHITE:        Judge, I did the best I could to anticipate, based on their schedule and our schedule and to try to mesh that. They're both meeting with patients and that - - that's the best I can do in terms of anticipation of how long we'd be here today. Uh, I missed it by twenty (20) minutes.

BY THE COURT:        We could have finished a [sic] testimony today.

BY MR. WHITE:        Well . . .

BY THE COURT:        You said thirty (30) minutes each.

BY MR. WHITE:        Yes, sir, then we would have been here til 6:00 and uh, I didn't think that was something we routinely done, [sic] Judge, but my apologies.

28

And Your Honor, given the - - the closing and - - I think the closing is going to take at least two (2) hours[;] I know that we'd be coming back tomorrow in either scenario.

BY THE COURT:    Oh, I'm well aware of that, sir.

BY MR. WHITE:    Okay. Well I'm doing the best I can, Judge.

BY THE COURT:    I am very clear on who controls the criminal docket.  I'm also very clear of whose in charge of when we conduct the trial, and I want to make it very clear, I am much more concerned about the time and the schedule of those fourteen (14) to thirteen (13) people that [sic] I am any of your witnesses, all right?

BY MR. WHITE:    I understand, Judge.

BY MR. SMALL:    Yes, Your Honor.

BY MR. BECK:    Yes, Your Honor.

**BENCH CONFERENCE CONCLUDED**

BY THE COURT:    Ladies and gentlemen, we are going to recess for the day, we will resume at 9:00 o'clock in the morning.

**JURORS EXIT THE COURTROOM**

When the trial court reconvened the next morning, the State rested.  At that point, Defendant made his motion for surrebuttal.  It is not clear why the State elected not to call its two experts, but it had little incentive to do so, as it was allowed to introduce evidence from non-testifying professionals.

The State wanted to adduce evidence that contradicted Dr. Simoneaux's analysis and was ultimately able to do so in violation of La.Code Evid. 705.  For admission of hearsay to require a reversal, substantial rights of the accused must have been affected. *State v. Rault*, 445 So.2d 1203 (La.) *cert denied*, 469 U.S. 873, 105 S.Ct. 225 (1984).  In *Birklett*, 749 So.2d 817, the error under La.Code Evid. 705 was found to be harmless due to the overwhelming evidence against the defendant.  However, in the present case, we find the substantial rights of Defendant were

affected, given the centrality of the sanity issue. Therefore, the error is not harmless, as it focused on the chief issue of the case, i.e., Defendant's sanity. For these reasons, we find this matter should be reversed and remanded to the trial court for re-trial.

Because we find merit in Defendant's assignment number five, there is no need to discuss the remaining assignments of error.

## DECREE

The trial court erred by allowing cross-examination during surrebuttal about the reports and conclusions of non-testifying psychologists and psychiatrists; these reports and conclusions addressed sanity, the key issue in this case. Therefore, Defendant's convictions and sentences are reversed, and the case is remanded to the trial court for re-trial.

**REVERSED AND REMANDED.**